**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

CAROLE GRANT HALL, individually and on behalf of all others similarly situated,

       *Plaintiff*,

    *v.*

TUNEUP CORPORATION, a Delaware corporation,

       *Defendant*.

Case No. 1:13-cv-01804

Honorable Samuel Der-Yeghiayan

## FIRST AMENDED CLASS ACTION COMPLAINT

Plaintiff Carole Grant Hall ("Plaintiff" or "Hall") brings this First Amended Class Action Complaint ("Complaint") against Defendant TuneUp Corporation ("Defendant") to obtain redress for, and put an end to, Defendant's deceptive marketing and sale of certain of its software products. Plaintiff, for her Complaint, alleges as follows upon personal knowledge as to herself and her own acts and experiences and, as to all other matters, upon information and belief, including investigation conducted by her attorneys.

## NATURE OF THE ACTION

1.    Defendant develops software that it claims will increase the speed, performance and stability of a consumer's personal computer ("PC"), remove harmful errors, and improve Internet performance. Unfortunately for consumers, the methods that Defendant uses to induce them into purchasing its software, as well as the software itself, are fraudulent.

2.    Defendant represents that the software at issue in this lawsuit—TuneUp Utilities—is capable of increasing system startup speeds, optimizing computer performance, and removing harmful computer errors.

3.      To demonstrate TuneUp Utilities' purported value, consumers are encouraged to download a free trial version of the software to perform a diagnostic scan, which Defendant claims will detect and fix harmful computer errors. After an initial scan, TuneUp Utilities reports in alarmist fashion that dozens of harmful errors and other threats exist on the consumer's PC (when, in reality, the errors detected do not cause appreciable harm to a computer).

4.      Users may utilize the software for fourteen (14) days, at the end of which the trial period expires, and they must purchase the full version of the software to continue using it. In this way, consumers are led to believe that the software is functioning as advertised—*i.e.*, effectively detecting and removing errors that cause system-wide problems—when in fact, that's simply not the case.

5.      As detailed herein, neither the free trial nor the full registered versions of the TuneUp Utilities software perform credible diagnostic scans of a user's PC, nor do they provide the other supposed benefits represented by Defendant. Instead, Defendant intentionally designed TuneUp Utilities to invariably report in an ominous manner that harmful errors and other problems are afflicting a consumer's PC. Accordingly, consumers are duped into purchasing and continuing to use software that does not function as warranted by Defendant.

**PARTIES**

6.      Plaintiff Carole Grant Hall is a natural person and citizen of the State of Illinois.

7.      Defendant TuneUp Corporation is a corporation incorporated in and existing under the laws of the State of Delaware, with its headquarters and principal place of business located at 1221 Brickell Avenue, 9th Floor, Suite 900, Miami, Florida 33131. Defendant conducts business throughout the United States, the State of Illinois, and this District.

## JURISDICTION AND VENUE

8.      The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2), because (i) at least one member of the Class is a citizen of a state different than Defendant, (ii) the amount in controversy exceeds $5,000,000, exclusive of interests and costs, and (iii) none of the exceptions under that subsection apply to this action.

9.      This Court has personal jurisdiction over Defendant because it conducts business in Illinois and the unlawful conduct alleged in the Complaint occurred in, was directed to, and/or emanated from Illinois.

10.     Venue is proper in this District under 28 U.S.C. § 1391(b) because the injuries of which Plaintiff complains were directed to, and/or emanated from this District. Venue is additionally proper because Defendant transacts significant business in this District, including soliciting consumer business.

## FACTUAL BACKGROUND

### I.      A Brief Overview of TuneUp Corporation.

11.     Defendant claims that it develops "innovative software for sophisticated users that [set] new standard[s] for security and user-friendliness in the utility software" industry. To that end, Defendant purports that its software protects consumers "from PC problems, while helping them increase the performance and security of their computers."

12.     In terms of its reputation in the software industry, Defendant boasts that its "brand has stood for high-quality products that offer maximum customer benefit" since the company's inception, because it continually develops software products to meet the needs of its customers. One such software product is TuneUp Utilities.

13.      In 2011, AVG Technologies, a publicly traded corporation and competitor of
Defendant, acquired TuneUp Corporation. Of note, AVG Technologies develops utility software
(similar in functionality to TuneUp Utilities) that is at issue in a class action lawsuit being
prosecuted by Plaintiff's counsel and currently pending in the United States District Court for the
District of Massachusetts. *See Theis v. AVG Technologies USA, Inc.*, No. 12-cv-10920-RGS (D.
Mass. May 5, 2012).

**II.      Defendant Deceptively Convinces Consumers that TuneUp Utilities is Capable of
Detecting Errors that Cause Harmful Computer Problems When, in Fact, it is not.**

14.      Defendant advertises, promotes, and sells the TuneUp Utilities software across the
Internet through sponsored advertisements on search engines and third party websites, as well as
its own webpage, www.Tune-Up.com.

15.      Clicking on one of these advertisements directs a consumer to Defendant's
website, where it expressly warrants TuneUp Utilities' functionality.

16.      In particular, Defendant describes certain commonly occurring computer
problems, and represents that TuneUp Utilities will detect and remove the errors that cause such
problems. For instance, the marketing materials on Defendant's website are designed to appeal to
users frustrated with the following commonly-occurring computer problems:

> •      "When working at your PC, you get countless error messages,
> performance is unusually low and there are constant delays…TuneUp
> Registry Cleaner solves these problems by detecting and fixing registry
> errors….";
>
> •      "Unusual slowdowns when running Windows®, working with all your
> applications and playing games…That's why TuneUp Drive Defrag

4

restores perfect order to your hard drive while speeding up file access,

boot times, and program launches….”; and,

- “Your PC is getting slower and slower, startup time takes ages and your
hard disk is chock-full of unnecessary files…Our maintenance features
eliminate system-hogging data clutter and prevents the typical ‘Windows
slowdown’ effect….”

17.    Defendant then suggests that TuneUp Utilities detects and fixes the errors that
cause the problems listed above. For example, Defendant asserts through its website that TuneUp
Utilities is designed to:

- “fix, speed up and maintain your PC with ease!”;

- “get your PC in top shape!”;

- “optimize your system”;

- “make[] sure your PC becomes cleaner and faster than ever before”; and,

- “fix[] registry problems more effectively.”

18.    The cumulative effect of Defendant’s representations regarding the software’s
functionality is that average consumers, seeking a solution to fix their malfunctioning computers,
will understandably believe that TuneUp Utilities detects and removes harmful errors that lead to
the computer problems described by Defendant in its marketing materials above (*e.g.*, problems
causing error messages, system delays, and slow startup times).

19.    In reality, Defendant designed TuneUp Utilities—both the free trial version and
the full registered version—to deceptively convince users that purchase and continued use of the
software is necessary.

**III.     Defendant Baits Consumers with a "Free Trial" Version of TuneUp Utilities, Which is Designed to Invariably Report Harmful Errors to Induce Users to Purchase and Continue to Use the Full Registered Version.**

20.     Through its website, Defendant encourages consumers to download a free trial version of TuneUp Utilities to test out the software for 14 days.

21.     Once the consumer downloads and installs TuneUp Utilities, the next phase of Defendant's deceptive scheme begins: the software appears to detect and remove dozens of harmful errors that are supposedly afflicting the computer, in an effort to induce the consumer into purchasing the full, registered version of the software.

22.     Upon performing a scan with TuneUp Utilities, the average PC user is informed that hundreds of errors are affecting their computer's performance. *See* Figure 1 (showing a screenshot of TuneUp Utilities' error reporting interface). TuneUp Utilities then displays a list of the purported "diagnostic tests" performed on the computer and the corresponding errors or problems detected by the software. *See id*. The software also reports—using both ominous red typeface and a graphical depiction of a red and white warning sign—that the scan is complete and that the problems detected are causing "[s]trong system interference." *See id*.



(Figure 1.)

23. Contrary to the software's representations, however, the truth is that neither the free trial version nor the full registered version of TuneUp Utilities actually perform any meaningful evaluation of the user's computer system. Nor can TuneUp Utilities possibly perform the beneficial operations warranted by Defendant through its websites, advertising, and in-software displays screens.

24. Through her attorneys, Plaintiff engaged a computer forensics expert to examine the TuneUp Utilities software. The results of this investigation confirm that the free trial version, as well as the full, registered version of TuneUp Utilities detect non-errors as harmful computer problems, and mischaracterizes the overall status of a user's computer—all without real, credible diagnosis of the user's system.

25. For example, Figure 2 below shows the results of an initial diagnostic scan conducted by Plaintiff's expert using TuneUp Utilities *on a brand new computer*, in a pristine virtual computing environment. The scan's results claim that "99 problems" have been detected

on the user's computer, and that analysis reveals that the computer is afflicted by "Medium system interference."



(Figure 2.)

26.     Additionally, after inspection of the scan's results it appears that of the "99 problems" reported by TuneUp Utilities', dozens of the errors detected are simply empty "registry[1] keys." But, research commissioned by Plaintiff's counsel shows that it would require close to 100,000 empty registry keys to cause any statistically significant impact on a user's computer. In other words, any representation that small numbers of empty registry keys are causing a user's computer "Medium system interference" is deceptive at best.

27.     To that end, Plaintiff's expert was able to determine that the introduction of just *seventy-one* registry errors, without any other problems, causes TuneUp Utilities to report that a user's computer suffers from "Medium system interference." *See* Figure 3 (showing a side-by-side comparison of TuneUp Utilities detecting 70 registry errors and not reporting any "system

---

1       The "registry" is a database of configuration settings that helps facilitate the operation of computer applications on the operating system. A "registry key" can be thought of as a placeholder within the registry that contains a value, such as the default font size in Microsoft Word.

interference," and TuneUp Utilities detecting 71 registry errors and reporting "Medium system interference.")



(Figure 3.)

28.     The take-away from these findings is that, regardless of the condition of an individual user's computer system, it will *always* appear to the user that the software is properly functioning as an error-detection and removal utility. What's clear about TuneUp Utilities' design—and a common tactic used in this industry—is that users of the free trial version are deceived into believing that their computers are damaged (or harmed by "system interference" in Defendant's parlance), and that continued use of the software (*i.e.*, purchase of the full version of the software), is necessary to ensure the integrity of their computer.

29.     Put simply, users are lured into a false sense of *insecurity* by TuneUp Utilities' scan results, because they believe that the non-threatening errors detected correspond with the problems that Defendant claims the software was designed to fix. But that's simply not the case, as Defendant's diagnostic methods are wholly arbitrary.

9

30.     Furthermore, and emblematic of the deceptive nature of the software's design, in

certain instances after checking to determine whether the computer has antivirus software

operating on it, TuneUp Utilities displays an ominous "warning sign" and, upon click, directs the

user to a webpage that Defendant claims will fix this issue. *See* Figure 4 (showing the

aforementioned warning [circled] displayed to users through TuneUp Utilities).



(Figure 4.)

31.     Defendant's webpage providing the recommended "fix" reads in part, "TuneUp

Utilities has detected that either an anti-virus or a firewall software is not running on your

computer. Install and activate the missing security software immediately!" *See* Figure 5

(showing the webpage users are directed to upon clicking on the Warning sign shown in Figure

4). Notably, the user is then encouraged to download and install a free trial of antivirus software

developed by its own parent company. *See id*. Using this method, TuneUp Utilities drives more

users, by means of scare tactics, to utilize software for Defendant's parent company's gain.

10

---

**Install and Activate Virus Protection and Firewall**

**TuneUp Utilities has detected that either an anti-virus or a firewall software is not running on your computer. Install and activate the missing security software immediately!**

Anti-virus programs and personal firewalls are considered to be standard equipment of every Windows PC. These programs protect your system and your data from malicious software such as computer viruses, worms, and Trojan horses. Malicious software might steal personal information as well as credit card details and passwords for online banking sites.

**We strongly advise you to use an up-to-date anti-virus software!**

Free anti-virus programs including spyware protection are sufficient for most cases. Generally, they are restricted to personal use and they are not as feature-rich as commercial products, but they do offer basic protection. TuneUp Software recommends AVG AntiVirus Free.

---

(Figure 5.)

32.     Through the deceptive scheme described above, Defendant has profited, and continues to profit, by defrauding consumers into believing that their computers are damaged and/or at risk, and that the purchase—for $29.95—and continued use of TuneUp Utilities is necessary to "fix" these problems. Because the software cannot actually repair the problems advertised by Defendant, including those described in paragraphs 16–17 above, and arbitrarily mischaracterizes the condition of the computer, Defendant does not deliver on its promises to its users.

**IV.     Defendant is not Alone in its Fraudulent Conduct.**

33.     Unfortunately for consumers, Defendant is not alone in its use of the sorts of fraudulent programmatic design and marketing practices at issue in this case. Rather, the "utility software" industry has been fraught with these tactics for over a decade. It is only recently, however, that software developers—like Defendant and its competitors—have been called to account for their profiting off of consumers who are unable to identify the fraudulent technological design and methodologies underlying this type of supposedly performance-enhancing software.

34.     Indeed, numerous lawsuits have been filed against well-known competitors of Defendant (*e.g.*, Symantec Corp. and McAfee, Inc.) by Plaintiff's counsel here—alleging similar claims related to the fraudulent design and marketing of so-called utility software products, as

well as against Defendant's own parent corporation (AVG Technologies), as described above. Several of those cases have resulted in classwide settlements and industry-changing modifications to the software products at issue—making their detection, reporting and repairing mechanisms far more transparent and more accurately informing consumers of the threats posed by existing errors on their computers—and still others are pending.

35.     Rather than make the necessary changes to its software so that it actually and honestly detects, reports and repairs errors and other problems affecting users' PCs, Defendant has remained steadfast in its fraudulent conduct and, to this day, continues to profit from it.

**FACTS RELATING TO PLAINTIFF CAROLE GRANT HALL**

36.     In or around April 2012, Plaintiff Hall encountered one of Defendant's online advertisements for TuneUp Utilities while browsing the Internet. Defendant's advertisement warned Plaintiff that her computer may be afflicted by hundreds of harmful computer errors, that the TuneUp Utilities software would purportedly diagnose and/or repair the purported problems, and that the software would optimize and increase the speed and performance of her computer and Internet browser.

37.     In order to diagnose and/or repair the purported problems, and otherwise optimize and enhance the speed and performance of her computer, Defendant, through its advertisement, suggested that Hall download a free trial version of TuneUp Utilities. Heeding that directive, Hall navigated to Defendant's website—www.Tune-Up.com—to learn more about the software.

38.     Relying upon the representations contained on Defendant's webpages—namely, that TuneUp Utilities would accurately identify, report and repair a variety of computer errors and other problems, enhance the performance and speed of her computer, and perform such

beneficial tasks as those described in paragraphs 16, 17, and 36 above⸺Hall downloaded the software.

39.     After downloading and installing the free trial version of the TuneUp Utilities software, Hall performed a diagnostic "scan" of her computer. The software reported that her computer was afflicted with hundreds of errors, which were causing "[s]trong system interference" and that her computer needed to be repaired.

40.     After performing a "fix" with the software, and relying upon Defendant's warranties about the functionality and utility of TuneUp Utilities, as well as the software's representations that her computer was in serious need of repair, Hall agreed to purchase and register the full version of TuneUp Utilities for $29.95.

41.     In reality, the errors "detected" by TuneUp Utilities on Hall's PC were exaggerated and were not actually causing damage to her computer as indicated. Tellingly, every time Hall ran TuneUp Utilities' diagnostic scan, the software reported that harmful errors were adversely affecting her computer and that she needed to "fix" the errors using the software— even after having supposedly "fixed" the errors as previously detected by the software. As such, Hall was misled into believing that her computer was at-risk and that she needed to purchase and continue to use the full version of TuneUp Utilities in order to repair and/or protect it from the purported errors and problems going forward.

42.     Despite the fact that Hall repeatedly used the TuneUp Utilities software, and purportedly "fixed" any reported errors, the speed and performance of her computer began to deteriorate. In fact, after using the software, the performance of Hall's computer deteriorated to the point where it would frequently freeze—requiring hard-resets and/or forced shutdowns to regain use of her computer (*i.e.*, removing the computer's power source).

43.     But for Defendant's representations through its online advertisements and webpages regarding the functionality and benefits of TuneUp Utilities, Plaintiff would not have downloaded, installed, and ran the software on her computer. Similarly, but for the misrepresentations made by the TuneUp Utilities software itself—namely, that her computer was damaged by hundreds of errors and subject to "[s]trong system interference"—Hall would not have agreed to purchase the software.

44.     Additionally, because the full, registered version of TuneUp Utilities cannot actually perform to the level of utility represented by Defendant (*i.e.*, it did not perform any credible assessment of her PC, nor accurately categorize, report and repair "errors"), she purchased a software product that is worth less than what was reflected in the purchase price she paid.

## CLASS ALLEGATIONS

45.     **Class Definition:**  Plaintiff brings this action pursuant to Fed. R. Civ. P. 23(b)(2) and (b)(3) on behalf of herself and a class of similarly situated individuals, defined as follows:

> All individuals and entities in the United States and its territories who purchased the TuneUp Utilities software.

Excluded from the Class are (1) Defendant, Defendant's agents, subsidiaries, parents, successors, predecessors, and any entity in which Defendant or its parents have a controlling interest, and those entity's current and former employees, officers, and directors, (2) the Judge to whom this case is assigned and the Judge's immediate family, (3) persons who execute and file a timely request for exclusion from the Class, (4) persons who have had their claims in this matter finally adjudicated and/or otherwise released, and (5) the legal representatives, successors, and assigns of any such excluded person.

46. **Numerosity:** The exact number of members of the Class is unknown and is not available to Plaintiff at this time, but individual joinder in this case is impracticable. The Class likely consists of thousands of individuals and other entities. Class members can be easily identified through Defendant's records and public records.

47. **Commonality and Predominance:** There are many questions of law and fact common to the claims of Plaintiff and the other members of the Class, and those questions predominate over any questions that may affect individual members of the Class. Common questions for the Class include but are not limited to the following:

    a)     whether Defendant intentionally designed TuneUp Utilities to deceive consumers into purchasing the full version of the software;

    b)     whether Defendant's conduct described herein constitutes violations of the Illinois Consumer Fraud and Deceptive Practices Act, 815 ILCS 505/1, *et seq*.;

    c)     whether Defendant's conduct described herein constitutes fraudulent inducement;

    d)     whether Defendant's conduct described herein constitutes a breach of contract; and

    e)     whether Defendant has been unjustly enriched as a result of its conduct described herein.

48. **Typicality:** Plaintiff's claims are typical of the claims of the other members of the Class. Plaintiff and the Class sustained damages as a result of Defendant's uniform wrongful conduct during transactions with Plaintiff and the Class.

49. **Adequate Representation:** Plaintiff will fairly and adequately represent and protect the interests of the Class members, and has retained counsel competent and experienced in complex class actions. Plaintiff has no interest antagonistic to those of the Class and Defendant has no defenses unique to Plaintiff.

50. **Policies Generally Applicable to the Class:** This class action is also appropriate for certification because Defendant has acted or refused to act on grounds generally applicable to the Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the members of the Class, and making final injunctive relief appropriate with respect to the Class as a whole. Defendant's policies challenged herein apply and affect the members of the Class uniformly and Plaintiff's challenge of these policies hinges on Defendant's conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiff.

51. **Superiority:** This case is also appropriate for certification because class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy. The injuries suffered by the individual members of the Class are likely to have been relatively small compared to the burden and expense of individual prosecution of the litigation necessitated by Defendant's actions. Absent a class action, it would be difficult, if not impossible, for the individual members of the Class to obtain effective relief from Defendant. Even if members of the Class themselves could sustain such individual litigation, it would not be preferable to a class action because individual litigation would increase the delay and expense to all parties and the Court and require duplicative consideration of the legal and factual issues presented herein. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economies of scale, and comprehensive supervision

16

by a single Court. Economies of time, effort, and expense will be fostered, and uniformity of decisions will be ensured.

52.     Plaintiff reserves the right to revise the foregoing "Class Allegations" and "Class Definition" based on facts learned through additional investigation and in discovery.

### FIRST CAUSE OF ACTION
**Violation of the Illinois Consumer Fraud and Deceptive Practices Act**
**815 ILCS 505/1,** *et seq.*
**(On behalf of Plaintiff and the Class)**

53.     Plaintiff incorporates by reference the foregoing allegations as if fully set forth herein.

54.     The Illinois Consumer Fraud and Deceptive Practices Act, 815 ILCS 505/1, *et seq.* (the "Consumer Fraud Act"), protects both consumers and companies by promoting fair competition in commercial markets for goods and services.

55.     The Consumer Fraud Act prohibits any unlawful, unfair or fraudulent business acts or practices including the employment of any deception, fraud, false pretense, false promise, misrepresentation, or the concealment, suppression, or omission of any material fact.

56.     The utility of a consumer product is a material term of any transaction because it directly affects a consumer's choice of, or conduct regarding, whether to purchase a product. Any deception or fraud related to the utility of a product is materially misleading.

57.     As described herein, Defendant has engaged in deceptive and fraudulent business practices, as defined by the Consumer Fraud Act by, *inter alia*: (i) misrepresenting the utility and functionality of TuneUp Utilities, including through assertions such as those described in paragraphs 16–17, (ii) misrepresenting the health, performance and security of users' computers through in-software representations found in the free trial and full registered versions of the software, (iii) using the misrepresentations to induce consumers into purchasing and continuing

to use TuneUp Utilities, and (iv) selling a full version of the software that lacked the advertised utility, similarly produced false errors reports, and otherwise was incapable of functioning as Defendant represented it would.

58.     Defendant's representations were, in fact, false. Defendant's software does not (and cannot) actually perform all of the benefits that Defendant promises through its marketing and websites. Likewise, TuneUp Utilities' scan results were false, because the software did not perform any meaningful evaluation of Plaintiff's and the Class's computers or any problems contained thereon before representing to them that their computers needed repair.

59.     Furthermore, the only reason for consumers to purchase TuneUp Utilities is to ensure any errors or other problems are remedied and to increase their computers' performance. As such, the free trial version's false results and its failure to offer the level of utility advertised by Defendant were deceptive and were likely to mislead consumers acting reasonably under the circumstances. Likewise, the full version is likely to mislead reasonable consumers into believing that the software is functioning as advertised and that it is necessary to continue to use the software to maintain the health and security of their computers.

60.     Defendant has violated the "unfair" prong of the Consumer Fraud Act in that it caused substantial injury to consumers through its actions identified above. The injury caused by Defendant's conduct is not outweighed by any countervailing benefits to consumers, and the injury is one that consumers themselves could not reasonably have avoided. Given the information asymmetry between Defendant and consumers regarding TuneUp Utilities' functionality, Defendant knew or had reason to know that Plaintiff and the Class could not reasonably have known of or discovered the falsity of Defendant's representations or avoided the harm those misrepresentations caused.

61. Defendant has also violated the "fraudulent" prong of the Consumer Fraud Act in that its statements, advertisements, and representations regarding the utility and functionality of TuneUp Utilities—the same or substantially similar to those described in paragraphs 16–17, and in the results of the software's scans—are false and likely to deceive a reasonable consumer, as described herein.

62. Defendant's unfair and deceptive conduct occurred during the marketing and sale of computer software products, and therefore occurred in the course of Defendant's business practices.

63. Defendant's unfair and deceptive conduct directly and proximately caused Plaintiff and the Class actual monetary damages in the form of the price paid for TuneUp Utilities (or, at least, a portion thereof)—typically $29.95.

64. Plaintiff seeks an order: (i) permanently enjoining Defendant from continuing to engage in the unfair and deceptive conduct described herein, (ii) requiring Defendant to pay actual and compensatory damages, and (iii) requiring Defendant to pay interest, attorneys' fees and costs.

**SECOND CAUSE OF ACTION**
**Fraudulent Inducement**
**(On behalf of Plaintiff and the Class)**

65. Plaintiff incorporates by reference the foregoing allegations as if fully set forth herein.

66. As described with particularity throughout this Complaint, Defendant has used, and continues to use, marketing tactics it knows or reasonably should know are false and misleading.

67. To induce Plaintiff and the Class to purchase TuneUp Utilities, Defendant

affirmatively represented that TuneUp Utilities provided a certain level of utility. Specifically, Defendant represented that TuneUp Utilities would honestly and accurately scan Plaintiff's and the Class's computers for harmful errors and problems, increase their computers' speed and performance, protect their computers' security, and otherwise perform the beneficial tasks described in paragraphs 16–17 above. Further, through TuneUp Utilities itself, Defendant affirmatively represented that Plaintiff's and the Class's computers were afflicted with dozens (if not hundreds) of harmful errors and problems, thus necessitating the purchase and use of a full version of the software.

68.     Defendant's affirmative representations were, in fact, false. In particular, the TuneUp Utilities software cannot increase the performance of a user's computer in the manner described by Defendant, or repair errors and problems as represented through its marketing.

69.     The utility of a consumer product is a material term of any transaction because it directly affects a consumer's choice of, or conduct regarding, whether to purchase a product. Any deception or fraud related to the utility of a product is materially misleading.

70.     As TuneUp Utilities' designer, Defendant knew that its representations about TuneUp Utilities' functionality were false. Defendant intentionally designed its public representations to mislead consumers about TuneUp Utilities' functionality, and programmed TuneUp Utilities (both the free trial and full registered versions) to falsely report and exaggerate the existence and effects of computer errors and problems to deceive users about their computers' system health, performance and security.

71.     Defendant intended that its misrepresentations would induce consumers to rely on, and act based on, the false claims of a computer's health or lack thereof. Defendant made these misrepresentations with the specific purpose to induce Plaintiff and the other members of

the Class to rely upon them when downloading and paying to register a full version of the TuneUp Utilities software, and thereafter continuing to use the software.

72.     As a consumer lacking the requisite technical expertise to independently assess TuneUp Utilities' underlying functionality, and taking Defendant's statements at face value, Plaintiff justifiably relied upon Defendant's misrepresentations by purchasing, downloading and continuing to use the software. Plaintiff would not have purchased, nor continued to use, TuneUp Utilities but for Defendant's misrepresentations that her computer was in need of repair and that TuneUp Utilities was capable of making such repairs.

73.     By using false and fraudulent marketing tactics, and exaggerated and deceptive in-software representations, Defendant has engaged in fraudulent practices designed to mislead and deceive consumers into purchasing TuneUp Utilities.

74.     As a result of their reasonable reliance upon Defendant's misrepresentations, Plaintiff and the Class have been damaged in the amount of TuneUp Utilities' purchase price, or at least a portion thereof.

75.     Plaintiff therefore prays for damages in the amount she paid to purchase TuneUp Utilities, or a portion thereof. Further, because Defendant's conduct and misrepresentations were malicious and in conscious disregard for Plaintiff's and the Class's rights, both she and the Class are entitled to punitive damages in an amount sufficient to deter such conduct in the future.

### THIRD CAUSE OF ACTION
### Breach of Contract
### (On behalf of Plaintiff and the Class)

76.     Plaintiff incorporates by reference the foregoing allegations as if fully set forth herein.

77.     Plaintiff and the Class members entered into valid and enforceable agreements

with Defendant whereby Defendant agreed to sell, and Plaintiff and the Class agreed to purchase, the TuneUp Utilities software that would accurately identify, report and repair legitimate computer errors and problems existing on Plaintiff's and the Class's computers, and otherwise increase the speed, performance and stability of the machines.

78.     Plaintiff and the Class paid, and Defendant accepted, TuneUp Utilities' purchase price (typically $29.95) and therefore, performed their obligations under the contracts.

79.     Defendant breached its contracts with Plaintiff and the Class by intentionally designing the full version of the TuneUp Utilities software to mischaracterize the true condition of computers, as described herein, and further by failing to provide software that performed the tasks described in paragraphs 16–17 above. These obligations are material terms of the agreement.

80.     Defendant did not honor these obligations inasmuch as TuneUp Utilities did not actually perform the beneficial tasks described by Defendant.

81.     Likewise, Illinois contract law recognizes the implied covenant of good faith and fair dealing in every contract. Thus, implicit in its contracts with Plaintiff and the Class were provisions prohibiting Defendant from engaging in conduct that frustrated or injured Plaintiff's and the Class's rights to receive the benefits of the agreement.

82.     Defendant acted in bad faith and breached these provisions of the agreement, specifically by not honoring its responsibilities to perform truthful diagnostic and remedial operations, as described herein, and instead, providing software that it intentionally designed to produce false errors reports, misrepresent the actual status of users' computers, and which was incapable of repairing the purported errors as advertised.

83.     Furthermore, Defendant was under an implicit obligation to comply with 815

ILCS 505/1, *et seq*., to be truthful in its advertisements, and to accurately disclose the functionality and utility of its software products. Defendant did not honor any of these obligations.

84.     Defendant breached the implied covenant of good faith and fair dealing by failing to (i) provide a full version of the software that would perform the benefits described in paragraphs 16–17 above, (ii) honestly and accurately inform consumers about the true condition of their computers as described herein, and (iii) fully comply with the proscriptions of applicable statutory law.

85.     The aforementioned breaches of contract have caused Plaintiff and the Class economic injury and damages, including in the form of the purchase price of the TuneUp Utilities software (or at least a portion thereof), because they purchased a product that does not perform as Defendant promised, and therefore lacks the utility contracted for.

**FOURTH CAUSE OF ACTION**
**Unjust Enrichment**
***In the alternative to Count III - Breach of Contract***
**(On behalf of Plaintiff and the Class)**

86.     Plaintiff incorporates by reference the foregoing allegations 1–75 as if fully set forth herein.

87.     If the Court finds Plaintiff's and the Class's contracts with Defendant invalid, non-existent, or otherwise unenforceable, Plaintiff and the members of the Class may be left without any adequate remedy at law.

88.     Plaintiff and the Class have conferred a benefit upon Defendant in the form of the money Defendant charged and collected from them for the purchase of the full version of the TuneUp Utilities software, which did not and could not perform as Defendant promised.

89.     Defendant appreciates and/or has knowledge of the benefits conferred upon it by Plaintiff and the Class.

90.     Under principles of equity and good conscience, Defendant should not be permitted to retain the monies belonging to Plaintiff and the Class that it unjustly received as a result of its wrongful conduct described herein.

91.     Accordingly, Plaintiff, on behalf of herself and the other members of the Class, seeks restitution and disgorgement of all amounts by which Defendant has been unjustly enriched.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Carole Grant Hall on behalf of herself and the Class, respectfully requests that this Court enter an order:

A.     Certifying this case as a class action on behalf of the Class defined above, appointing Carole Grant Hall as class representative, and appointing her counsel as class counsel;

B.     Declaring that Defendant's actions, as set out above, constitute (i) violations of the Illinois Consumer Fraud and Deceptive Practices Act, 815 ILCS § 505/1, *et seq.*, (ii) fraudulent inducement, (iii) breach of contract, and (iv) unjust enrichment (in the alternative to breach of contract);

C.     Awarding injunctive and other equitable relief as necessary to protect the interests of the Class, including, *inter alia*, an order prohibiting Defendant from engaging in the wrongful and unlawful acts described herein;

D.     Awarding damages to Plaintiff and the Class in an amount to be determined at trial;

E.     Awarding restitution to Plaintiff and the Class in an amount to be determined at

trial, and requiring that Defendant disgorge all monies by which it was unjustly enriched;

F.     Awarding Plaintiff and the Class their reasonable litigation expenses and

attorneys' fees;

G.     Awarding Plaintiff and the Class pre- and post-judgment interest, to the extent

allowable; and

H.     Awarding such other and further relief as the Court deems reasonable and just.

### DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury for all issues so triable.

                              Respectfully submitted,

                              **CAROLE GRANT HALL**, individually and on
                              behalf of all others similarly situated,

Dated: April 15, 2013         By: /s/ Benjamin H. Richman
                                   One of Plaintiff's Attorneys

                              JAY EDELSON
                              jedelson@edelson.com
                              RAFEY S. BALABANIAN
                              rbalabanian@edelson.com
                              BENJAMIN H. RICHMAN
                              brichman@edelson.com
                              CHANDLER R. GIVENS
                              cgivens@edelson.com
                              EDELSON LLC
                              350 North LaSalle, Suite 1300
                              Chicago, Illinois 60654
                              Telephone: (312) 589-6370
                              Facsimile: (312) 589-6378

## CERTIFICATE OF SERVICE

I, Benjamin H. Richman, an attorney, hereby certify that on April 15, 2013, I served the above and foregoing *Plaintiff's First Amended Class Action Complaint* by causing a true and accurate copy of such paper to be filed and served on all counsel of record via the Court's CM/ECF electronic filing system, on this 15th day of April 2013.

/s/ Benjamin H. Richman