## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | |
|---|---|
| CAROLE GRANT HALL, individually and on behalf of all others similarly situated, | Case No. 13-cv-01804 |
| *Plaintiff*, | Honorable Samuel Der-Yeghiayan |
| *v.* | |
| TUNEUP CORPORATION, a Delaware corporation, | |
| *Defendant*. | |

## PLAINTIFF'S OPPOSITION TO DEFENDANT'S
## MOTION TO DISMISS THE FIRST AMENDED COMPLAINT

**INTRODUCTION**

This case challenges Defendant TuneUp Corporation's ("TuneUp") deceptive design and marketing of its TuneUp Utilities software. Through its marketing materials and representations—found on its website, across the Internet and in the software itself—TuneUp misrepresents the functionality of its software and ultimately, tricks consumers into purchasing it.

TuneUp's fraudulent scheme takes the following form: consumers, like Plaintiff Carole Grant Hall ("Plaintiff" or "Hall"), searching the Internet for software to enhance the speed and performance of his or her computer or to cure any number of defects, will encounter TuneUp's advertising materials promising to do just that. From there, the consumers are directed to TuneUp's website where they view its representations about the purported functionality of the software (e.g., that it's capable of fixing freezes and crashes) and are offered a free trial version for download. Upon running the free version of the software, consumers are then presented with reports showing that their computers suffer from numerous errors and problems and are in immediate need of repair. After "fixing" the problems and when the free-trial period has ended, TuneUp urges users to purchase and continue to use the full version of the software to protect their computers going forward.

The deception forming the basis for Hall's claims is that neither the free trial nor the full versions of the software performs as advertised (i.e., accurately detecting, identifying and repairing harmful errors, eliminating freezes and crashes, and improving a computer's overall efficiency and performance). Instead and as confirmed by Plaintiff's computer forensics expert, TuneUp intentionally designed the software to invariably report that users' computers are suffering from numerous errors and problems and are in need of repair. As a result, Plaintiff Hall and the putative class she seeks to represent have all been damaged by TuneUp's conduct in that they were induced into paying for software that doesn't perform the beneficial tasks represented, and thus, isn't worth what they paid.

Unfortunately for consumers, TuneUp doesn't stand alone in undertaking such deceptive

1

practices. Similar lawsuits have been filed by Plaintiff's counsel against other industry actors, including

some of TuneUp's main competitors and its own parent company.[1] Several of those lawsuits have

resulted in class action settlements providing refunds to class members together with industry-leading

reforms when it comes to the design and marketing of such software.[2] Rather than embrace the reforms

adopted by other software makers, however, TuneUp instead seeks dismissal of Plaintiff's First

Amended Complaint (the "Complaint") on the following grounds: (i) that the End User License

Agreement that purportedly controls Plaintiff's purchase of the software ("EULA") identifies a German

entity—TuneUp Distribution GmbH ("TuneUp Distribution")—as the company from which Plaintiff

bought the software and thus, TuneUp has no liability here whatsoever; (ii) Plaintiff's fraud-based

claims fail to meet the heightened pleading requirements of Rule 9(b); (iii) Plaintiff's claim under the

Illinois Consumer Fraud Act ("ICFA") fails because she wasn't actually deceived and in any event,

TuneUp's alleged representations are mere puffery; (iv) Plaintiff failed to identify the contractual

provisions TuneUp breached and otherwise failed to plead sufficient facts to suggest that such a breach

occurred; and, (v) Plaintiff's alternative claim for unjust enrichment fails because a valid and

---

[1]     *See, e.g., Rottner v. AVG Tech. CZ, s.r.o.*, No. 12-cv-10920-RGS (D. Mass.) ("*Rottner* matter").
[2]     To date, nationwide class action settlements have been reached in the following cases: (i) *Drymon, et al. v. Cyberdefender Corp.*, No. 11 CH 16779 (Cir. Ct. Cook Cnty., Ill.) (Hon. K. Pantle, presiding) (Creating $9.75 million settlement fund from which class members can make claims for $10 for each product purchased, requiring Defendant to provide consumers with enhanced disclosures regarding the functionality of the software at issue, and obtaining changes to the software itself; settlement finally approved on Sept. 13, 2011); (ii) *Webb, et al. v. Cleverbridge, Inc., et al.*, No. 1:11-cv-04141 (N.D. Ill.) (Creating $4 million settlement fund from which class members can make claims for $8 for each product purchased and requiring defendants to provide consumers with enhanced disclosures regarding the functionality the software at issue; settlement finally approved on December 7, 2012); (iii) *LaGarde v. Support.com, Inc.*, No. 3:12-cv-00609-JSC (N.D. Cal.) (Creating $8.5 million settlement fund from which class members can make claims for $10 for each product purchased, providing three (3) free months of Support.com's anti-spyware software, requiring defendant to provide consumers with enhanced disclosures, and ensuring certain changes to the software itself; settlement finally approved on May 13, 2013); (iv) *Ledet v. Ascentive, LLC*, No. 2:11-CV-294-PBT (E.D. Penn.) (Creating $9.6 million settlement fund, class members can make claims for $18, requiring defendant to provide consumers with enhanced disclosures and securing certain changes to the software itself; settlement finally approved on November 19, 2012); and (v) *Gross v. Symantec Corp.*, No. 3:12-cv-00154 (N.D. Cal.) (Creating $11 million settlement fund from which class members can make claims for $9 for each product purchased, providing three (3) free months of Norton Antivirus software, requiring defendant to provide consumers with enhanced disclosures, and ensuring certain changes to the software itself; preliminary approval granted on May 28, 2013).

enforceable agreement exists between the Parties (i.e., the EULA) and even if it didn't, Plaintiff hasn't

alleged that TuneUp received or retained any benefit from her.

None of TuneUp's arguments withstand careful scrutiny. First, with respect to the argument—

which is based on the EULA—that TuneUp Distribution is the proper party-defendant because it

supposedly was the entity that Plaintiff dealt with, the EULA was not in effect or even published on the

TuneUp website at the time Plaintiff purchased the software and TuneUp offers nothing—for example,

by way of affidavit—to show otherwise or authenticate the EULA it seeks to rely on. Thus, having

never been presented to her, it would have been impossible for Plaintiff to have viewed and agreed to

the terms of the EULA and therefore, its application should be rejected. Even if that wasn't true (it is),

the EULA still cannot be appropriately considered at this stage of the litigation because Plaintiff hasn't

referenced it in her Complaint nor relied upon its terms in any way. Moreover, every representation on

the TuneUp website at the time Plaintiff purchased the software made clear that it was Defendant

TuneUp—not any other entity, let alone TuneUp Distribution—with which Plaintiff dealt and that

ultimately caused her injuries.

Second, Plaintiff has detailed the who, what, where, when and how of TuneUp's false

statements and fraudulent conduct, in full satisfaction of Rule 9(b)'s heightened pleading standard.

Thus, Plaintiff has sufficiently pleaded her fraud claims and gone above and beyond the requisite

specificity and particularity required at this stage of the proceedings.

Third, and in addition to pleading fraud with the requisite specificity, Plaintiff's ICFA claim

must survive because TuneUp's alleged misrepresentations were not mere puffery (i.e., TuneUp's

subjective opinions of the software), but rather, objective statements about the software's supposed

functional capabilities, which ultimately turned out to be false.

Similarly, Plaintiff has adequately pleaded the existence of an enforceable contract between the

parties for her purchase and TuneUp's sale of software that was capable of honestly and accurately identifying, reporting and repairing various computer problems and errors. Plaintiff fulfilled her end of the bargain by paying TuneUp the purchase price of the software, but TuneUp breached the agreement by failing to provide software that could perform as promised. Nothing additional need be pleaded for Plaintiff to sustain her claim for breach of contract.

Finally, Plaintiff's unjust enrichment claim should stand as well. It's pleaded in the alternative to her breach claim and only in the event that the Court finds that she has no adequate remedy at law. And, in alleging the claim, Plaintiff has sufficiently established that she conferred a benefit on TuneUp in the form of the monies she paid to purchase the software and that TuneUp has retained that benefit inasmuch as she has yet to receive a full refund of those monies.

For these reasons and as explained further below, TuneUp's motion should be denied.

## FACTUAL BACKGROUND

### I. TUNEUP MISREPRESENTS THE FUNCTIONALITY OF ITS SOFTWARE.

For years, TuneUp has touted itself as developing "innovative software" that protects consumers "from PC problems, while helping them increase the performance and security of their computers." (*See* First Amended Complaint, Dkt. 25 ["Compl."] ¶ 11.) One such product is its TuneUp Utilities software, which it promotes through online advertisements and on its website as being capable of detecting, reporting, and repairing various computer problems that prompt error messages, "clog" systems, and otherwise slow down and deteriorate a computer's performance. (*Id.* ¶¶ 16-17.)

TuneUp initially offers consumers a free trial version of the software on its website. (*Id.* ¶ 20.) Once installed and run, however, the trial version invariably alerts users to dozens—if not hundreds— of purported errors supposedly affecting their computers and that are in need of immediate repair. (*Id.* ¶¶ 21-22.) TuneUp ultimately represents that the detected errors can be "fixed" and the users'

computers protected from similar problems in the future if they pay to use the full version of the software (typically at a price of $29). (Compl. ¶ 32.)

Despite TuneUp's representations, however, the free trial version of TuneUp Utilites does not accurately identify errors or other problems on a user's computer, and thus, can't fix them either. Instead, TuneUp intentionally designed the software to misrepresent and exaggerate the existence and severity of errors and problems on a consumer's PC so as to induce them to purchase the full version of the software. (*Id.* ¶¶ 23-29.) Further, once purchased, the full version of the software operates in a nearly identical and deceptive manner and thus, lulls the consumer into a false sense of security that the software is functioning as advertised (by "identifying" and then "fixing" supposed errors). (*Id.*) Because the full version is designed in the same deceptive manner, it is likewise incapable of repairing reported errors and problems, or otherwise functioning as advertised by TuneUp. (*Id.*)

## II. PLAINTIFF RELIED UPON TUNEUP'S MISREPRESENTATIONS.

Plaintiff is one such consumer who fell victim to TuneUp's deceptive practices. In or around April 2012, Hall saw an online advertisement that warned her that her computer could be plagued with hundreds of harmful errors and suggested she install the free trial version of TuneUp Utilities. (*Id.* ¶¶ 36-37.) Before downloading the software, Hall visited Defendant's website to learn more about its functional capabilities. (*Id.* ¶ 37.) There, she viewed TuneUp's representations that the software could detect, report, and repair various computer errors, among other beneficial tasks. (*Id.* ¶ 38.) Relying on those representations, Hall downloaded and ran the software. (*Id.* ¶¶ 38-39.)

According to the software, Plaintiff's computer suffered from hundreds of errors and problems that were causing "[s]trong system interference." (*Id.* ¶ 39.) Plaintiff subsequently "fixed" her computer with the trial version of the software and then purchased the full version for $29 in reliance on TuneUp's representations about its functionality and to protect it going forward. (*Id.* ¶ 40.) But, despite

the fact that Hall repeatedly used the software, and purportedly "fixed" any reported errors, the speed

and performance of her computer began to deteriorate. (Compl. ¶ 42.) In fact, after using the software,

the performance of Hall's computer deteriorated to the point where it would frequently freeze—

requiring hard-resets and/or forced shutdowns to regain use of her computer (i.e., removing the

computer's power source). (*Id.*)

III. **PLAINTIFF'S COMPUTER FORENSICS EXPERT CONFIRMED THE DECEPTIVE NATURE OF TUNEUP'S REPRESENTATIONS AND SOFTWARE.**

Prior to filing this case, Plaintiff engaged a computer forensics expert to examine the TuneUp

Utilities software. (*Id.* ¶ 24.) The results confirmed her suspicions: TuneUp intentionally designed the

software such that it invariably reports the existence of numerous errors and problems on a users'

computer, regardless of the system upon which it is installed and without performing any real, credible

diagnosis of the user's computer. (*Id.*) In fact, Plaintiff's expert performed an initial diagnostic scan on

a *brand new computer*, and the "scan" reported "99 problems" and represented that this new computer

was afflicted by "Medium system interference." (*Id.* ¶ 25.) Upon closer examination, the expert

uncovered that dozens of the supposed "errors" were actually harmless empty "registry keys." (*Id.* ¶

26.)[3] Plaintiff's expert further determined that the software arbitrarily reports the level of interference

afflicting a computer. (*Id.* ¶ 26.) For example, if a scan "detects" 70 errors, a computer has no "system

interference," but if it "detects" 71, it has "Medium" interference. (*Id.* ¶¶ 27-29.)

---

[3]     The "registry" is a database of configuration settings that helps facilitate the operation of computer applications on the operating system. A "registry key" can be thought of as a placeholder within the registry that contains a value, such as the default font size in Microsoft Word. (Compl. ¶ 26 n.1.) In any event, TuneUp Utilities' representations that registry keys are causing any appreciable harm to a users' computer are simply false. Indeed, research commissioned by Plaintiff's counsel shows that it would require close to 100,000 empty registry keys to cause any statistically significant impact on a user's computer. (*Id.* ¶ 26.) Simply put, the representation that small numbers of empty registry keys are causing "interference" is deceptive at best. (*Id.*)

## IV.     TUNEUP IS NOT ALONE IN ITS FRAUDULENT ACTIVITIES.

Unfortunately for consumers, Defendant is not alone in its use of the sorts of fraudulent

programmatic design and marketing practices at issue in this case. The "utility software" industry has

been fraught with these tactics for over a decade. (Compl. ¶ 33.) It is only recently, however, that

software developers—like Defendant and its competitors—have been called to account for profiting off

of consumers who are unable to identify the fraudulent technological design and methodologies

underlying this type of supposedly performance-enhancing software. (*Id.*)

Indeed, numerous lawsuits have been filed against well-known competitors of TuneUp (*e.g.*,

Symantec Corp. and McAfee, Inc.)—including several by Plaintiff's counsel here—alleging similar

claims related to the fraudulent design and marketing of so-called utility software products, as well as

against Defendant's own parent corporation (AVG Technologies). (*Id.* ¶ 34.) The broader litigation to

date has resulted in multi-million dollar class action settlements and industry-changing reforms to the

software products at issue. (*Id.*; *see also supra* n.2.)[4]

## ARGUMENT

## I.     THE EULA IS NOT ENFORCEABLE.

As an initial matter, TuneUp's reliance on the EULA as creating a relationship between

Plaintiff and TuneUp Distribution is misplaced for several reasons. (Def. Mot. at 4-6.) First, despite

TuneUp's insistence, the EULA was not in effect or even published on TuneUp's website at the time

Plaintiff purchased the software in April 2012 and Defendant offers nothing—for example, by way of

affidavit—to show that it was. Even if that wasn't true (it is), the EULA still cannot be considered

because Plaintiff hasn't referenced it in her Complaint nor relied upon its terms in any way. Moreover,

---

[4]     Notably, TuneUp's parent corporation, AVG Technologies, has determined—after a failed bid to
dismiss the action pending against it in the District of Massachusetts and with the production of documents and
other information related to its marketing and software design practices looming—to explore the possibility of
resolution through private mediation. *See Rottner* matter, Dkt. 76.

every representation on the TuneUp website at the time Plaintiff purchased the software identified

TuneUp as the entity that designed the software and with which consumers were transacting business.

A.     The EULA was Never Presented to Plaintiff and does not Apply Here.

First, a review of TuneUp's website at the time Plaintiff downloaded and purchased the

software in April 2012 (and the several month period before and after) shows that the EULA simply

wasn't in existence at that time or, at the very least, wasn't actually posted to the website for consumers

to review and agree to. *See* TuneUp Terms and Conditions, available at:

http://web.archive.org/web/20120324004840/http://www.tune-up.com/company/terms/ (last visited

May 28, 2013).[5] Instead, the site expressly notes that TuneUp engaged the services of certain resellers

to deliver its software to consumers and that to the extent any EULA applied to a consumer's purchase,

it would be the EULA of the particular reseller from which they received the software. (*Id.*) In Hall's

case, the only reseller identified is an entity known as cleverbridge AG, not TuneUp Distribution.[6] (*Id.*)

In the end, having never been published on the TuneUp website, having never been presented

to Plaintiff, and with no other evidence to establish its authenticity, the EULA clearly doesn't apply.

B.     The EULA was not Incorporated by Reference into Plaintiff's Complaint.

Regardless of whether it actually existed at the time Plaintiff purchased the software (it didn't),

the EULA still can't be considered here because Plaintiff neither references it in her Complaint nor

relies upon its terms in any way. Indeed, in considering a motion to dismiss, the Court may look only to

---

[5]     These pages were retrieved from the Internet Archive's Wayback Machine, which periodically captures and stores images of webpages as they appear at different points in time. *See* Internet Archive Wayback Machine, available at: http://archive.org/web/web.php (last visited May 28, 2013). Because the pages are publicly available at the Internet Archive site and aren't subject to reasonable dispute, the Court may properly take judicial notice of them. *See, e.g., Am. Safety Cas. Ins. Co. v. City of Waukegan*, No. 07 C 1990, 2009 WL 855795 (N.D. Ill. Mar. 30, 2009) (citing *Denius v. Dunlap,* 330 F.3d 919, 926 (7th Cir. 2003)).
[6]     Notably, Plaintiff's counsel previously prosecuted a putative class action against cleverbridge AG that asserted claims for the company's sale of other allegedly fraudulent software. *See Webb, et al. v. Cleverbridge, Inc., et al.*, No. 11-cv-04141 (N.D. Ill.). That suit ultimately resulted in a nationwide class action settlement that was finally approved by the Honorable Joan Humphrey Lefkow on December 7, 2012.

the facts alleged in the pleadings, documents attached as exhibits or incorporated by reference in the complaint, and other matters of which judicial notice can be taken. *See ABN AMRO, Inc. v. Capital Int'l Ltd.*, No. 04-cv-3123, 2007 WL 845046 (N.D. Ill. Mar. 16, 2007). Further, the authenticity of the documents sought to be recognized must not be in dispute. *See Hostway Corp. v. JPMorgan Chase Bank, N.A.*, No. 09-cv-151, 2009 WL 2601359, at *5 (N.D. Ill. Aug. 24, 2009) (citing *Tierney v. Vahle*, 304 F.3d 734, 738 (7th Cir. 2002)).

TuneUp's EULA doesn't meet the requirements of this narrow exception. It's not attached to Plaintiff's Complaint, it's not referred to in the Complaint, it's not a public record, its authenticity is clearly in dispute, and it's not central to Plaintiff's claims. Not surprisingly, other district courts considering this issue on motions to dismiss in the fraudulent software cases have declined to acknowledge purportedly applicable EULAs. *See, e.g., Gross*, 2012 WL 3116158, at *11 ("Although the FAC does acknowledge the existence of the EULA, it does not include any factual allegations related to the content of the agreement, so the EULA cannot be 'central to the allegations.' Furthermore, Plaintiff challenges the enforceability of the EULA. Therefore, the Court declines to consider the EULA at this stage."); *Kulesa,* No. 8:12-cv-00725, Dkt. No. 49 at 15 ("The FAC does not include factual allegations related to the content of the agreement, nor is it evident that Plaintiff relies on the License…. [Thus], the Court finds that the License is not clearly 'central to the allegations' and declines to consider it at this stage of the litigation."). Accordingly, TuneUp's EULA is not the proper subject of judicial notice and should not be considered by the Court.[7]

### C.     Nothing Points to TuneUp Distribution as the Proper Party-Defendant Here.

Further undercutting TuneUp's arguments in this regard is the complete absence of any

---

[7]     TuneUp also relies upon the *Rottner* matter in this regard inasmuch as it describes how the plaintiff in that case (represented by the same attorneys as Hall here) stipulated to the authenticity of the EULA that applied to his purchase of the offending software and implies that this case is no different. However, unlike this case, the defendants in *Rottner* were able to establish the authenticity of the EULA by way of, for example, screenshots of the relevant webpages. (*See Rottner* matter, Dkt. 36, Exs. J, K.)

reference to TuneUp Distribution on the TuneUp website. For example, at the time Plaintiff

downloaded the software from www.Tune-Up.com, the "About Us" section of the website described

TuneUp Corp. as the entity "serv[ing] the North American market, *with a focus on…sales to

consumers…*." About Us, available at: http://web.archive.org/web/20120409162619/http://www.tune-

up.com/company/ (last visited May 28, 2013). Even more telling, the website's privacy policy during

that time identifies TuneUp as the entity responsible for operating the website and with whom

consumers were interacting. *See* TuneUp Privacy Policy, available at:

http://web.archive.org/web/20120328043413/http://www.tune-up.com/company/privacy/ (last visited

May 28, 2013). For these reasons too, it's clear that (despite Defendant's insistence to the contrary)

Defendant TuneUp (and not TuneUp Distribution) is the proper party-defendant here.

## II.     PLAINTIFF HAS SUFFICIENTLY PLEADED HER FRAUD-BASED CLAIMS.

TuneUp next argues that the Plaintiff fails to satisfy the heightened pleading requirements of

Rule 9(b) and further, that her ICFA claim fails because she wasn't deceived by its conduct and in any

event, its alleged misstatements were only puffery. Those arguments miss their mark too.

### A.     Plaintiff Satisfies Rule 9(b)'s Heightened Pleading Requirement.

In order to adequately state a claim for fraud, Rule 9(b) "requires the plaintiff to state the

identity of the person who made the misrepresentation, the time, place, and context of the

misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff."

*Simonian v. Weber-Stephen Prods. Co.*, 272 F.R.D. 218, 220 (N.D. Ill. 2011). Even still, it is sufficient

for a plaintiff to "provide[] a general outline of the alleged fraud scheme sufficient to reasonably notify

the defendants of their purported role in the scheme…." *Laborers' Pension Fund v. Glendale Assoc.,

Ltd.*, No. 10-cv-7371, 2011 WL 2976792, at *6 (N.D. Ill. July 14, 2011).

Plaintiff easily meets (and exceeds) Rule 9's heightened pleading requirements. She alleges

that in April 2012 ("when"), she viewed one of TuneUp's ("who") online advertisements, which

"suggested she download a free trial version of the TuneUp Utilities software." (Compl. ¶ 36.) Upon viewing and clicking that ad, she was directed to TuneUp's website ("where"), where she was presented with representations that the software "would accurately identify, report and repair a variety of computer errors and other problems, enhance the performance and speed of her computer," "fix, speed up and maintain your PC," and "detect[] and fix[] registry errors" (the "content"). (*Id.* ¶¶ 37-38.)

Plaintiff alleges further that "[r]elying upon [these] representations," she downloaded and installed the free trial version of the software. (*Id.* ¶¶ 38-39.) When she ran the software's diagnostic scan ("when"), its in-software report ("where") represented that her computer was plagued with "[s]trong system interference" as a result of hundreds of detected errors ("content"). (*Id.* ¶ 39.) After supposedly "fixing" her computer, and relying upon TuneUp's marketing and in-software representations, Hall agreed to purchase the full version of the software for $29. (*Id.* ¶ 40.)

Additionally, the Complaint makes clear that TuneUp knew its representations were false inasmuch as Plaintiff's computer forensics expert confirmed their falsity, and that TuneUp intended Plaintiff would rely upon the representations by purchasing a full version of the software. (*Id.* ¶¶ 24-29, 60-61.) It also describes how Plaintiff did, in fact, rely upon those representations by purchasing the software and was ultimately injured in the form of the difference between what she paid and the software's actual value—to the extent it has any. (*Id.* ¶¶ 43-44.)

These allegations undoubtedly satisfy the purpose of Rule 9(b) by giving TuneUp specific notice as to its role in the scheme. *Laborers' Pension Fund*, 2011 WL 2976792, at *6; *see also Second Chance Body Armor, Inc. v. Am. Body Armor, Inc.*, No. 94-cv-6178, 1996 WL 568794, at *3 (N.D. Ill. Sept. 30, 1996) (plaintiff sufficiently pleaded fraud even where time and place of the conduct weren't established, because it "provided sufficient information to expect defendant to formulate a response.").

**B.      Plaintiff Sufficiently Pleads Her ICFA Claim.**

TuneUp similarly attacks the sufficiency of Plaintiff's claim for its violations of the ICFA.

(Def. Mot. at 6–8.) As explained below, these arguments should be rejected.

        i.        <u>Plaintiff was Deceived by TuneUp's Fraudulent Conduct</u>.

First, as explained in Section II.A, *supra*, Plaintiff was actually deceived by Defendant's fraudulent design and marketing of the TuneUp Utilities software. That is, she viewed and relied upon TuneUp's representations—in online advertisements and on its website—that the software was capable of identifying and repairing exactly the sorts of problems her computer was suffering from (i.e., freezing and crashing). (Compl. ¶¶ 36-38.) Thereafter, she further relied upon the software's representations that her computer was suffering from "strong system interference" and needed immediate repair by paying for and continuing to use the full version of the software. (*Id.* ¶ 40.) Lacking the requisite knowledge and expertise to independently assess her computer's health or the software's utility, Plaintiff reasonably believed that TuneUp's representations about the software's functional capabilities and the health of her computer were truthful, and was deceived inasmuch as the software could not function as advertised and didn't provide a credible assessment of her computer's health. (*Id.* ¶¶ 41-44.) Nothing more need be pleaded in this respect. *See Jamison v. Summer Infant (USA), Inc.*, 778 F. Supp. 2d 900, 911 (N.D. Ill. 2011) (quoting *Connick v. Suzuki Motor Co.*, 675 N.E.2d 584, 595 (Ill. 1996)) (holding that deception under the ICFA could be established "where a buyer would have acted differently knowing [truthful] information, or if [the information is] the type…upon which a buyer would be expected to rely in making a decision whether to purchase.").

        ii.        <u>TuneUp's Alleged Misrepresentations are not Mere Puffery</u>.

Next, TuneUp's representations are also a far cry from puffery. In Illinois, a statement constitutes puffery when it "is merely a subjective description or opinion." *High Rd. Holdings, LLC v. Ritchie Bros. Auctioneers (Am.), Inc.*, No. 07-cv-4590, 2008 WL 450470, at *4 (N.D. Ill. Feb. 15,

2008) (internal citations and quotations omitted). By contrast, a representation the truth or falsity of

which can "be precisely determined" is not puffery, and may be actionable under a claim for fraud.

*Barbara's Sales, Inc. v. Intel Corp.*, 879 N.E.2d 910, 926 (Ill. 2007).

Here, TuneUp's alleged misrepresentations are not just its subjective opinions about the

software, but rather, objective descriptions of the software's functional capabilities (e.g., "fix, speed up

and maintain your PC"; "fix registry problems"), which inform consumers what the software can

supposedly do as it relates to the problems their computers are suffering from. Similarly, the in-

software statements made to Plaintiff and the putative class offer objective descriptions of their

computers' performance and health, which informed them of the specific errors, threats and other

problems purportedly affecting their computers. (*See* Section II.A., *supra*.) These are not the sorts of

vague and general statements that a consumer could not reasonably believe and have typically been

considered mere puffery.[8] *See, e.g., The Clearing Corp. v. Fin. and Energy Exch. Ltd.*, No. 09-cv-5383,

2010 WL 2836717, at *2 (N.D. Ill. July 16, 2010) (finding representations about a company's services

to be actionable when they "involve[d defendant's] capability to perform certain services.");

*Stenograph Corp. v. Microcat Corp.*, No. 86-cv-10231, 1989 WL 99543, at *2 (N.D. Ill. Aug. 22,

1989) (finding general statements actionable when they described the "present capabilities of

[defendant's] staff to address specific situations."); *see also Newcal Indus., Inc. v. Ikon Office Solution*,

513 F.3d 1038, 1053 (9th Cir. 2001) ("a statement is considered puffery if the claim is extremely

unlikely to induce consumer reliance. Ultimately, the difference…rests in the specificity of the claim.").

Accordingly, Defendant's arguments should be rejected in this regard as well.

---

[8] Courts considering similar arguments about nearly identical marketing statements promoting TuneUp's competitor's software have agreed with Plaintiff's position here. *See, e.g., Gross*, 2012 WL 3116158 at *10 (citing *Sanders v. Apple, Inc.*, 672 F. Supp. 2d 978, 987 (N.D. Cal. 2009)) (holding that software maker Symantec's representations regarding the functional capabilities of its so-called utility software were not mere opinions "or a 'vague superlative' that a 'consumer could not reasonably believe.'").

## III. PLAINTIFF SUFFICIENTLY PLEADED HER BREACH OF CONTRACT CLAIM.

TuneUp argues further that Plaintiff's breach of contract claim fails because the Complaint supposedly doesn't identify a specific contractual provision that TuneUp breached and even if it did, Plaintiff fails to allege facts that, if true, would establish such a breach. TuneUp is wrong again.

To state a claim for breach of contract, Plaintiff was required to allege: "(1) offer and acceptance, (2) consideration, (3) definite and certain terms, (4) performance by the plaintiff of all required conditions, (5) breach, and (6) damages." *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 560 (7th Cir. 2012) (quoting *Assoc. Benefit Servs., Inc. v. Caremark RX, Inc.*, 493 F.3d 841, 849 (7th Cir. 2007)). She does just that.

In particular, she alleges the existence of a valid sales contract whereby TuneUp agreed to sell, and she agreed to purchase, software that would accurately identify, report and repair legitimate computer errors and problems found on and improve the overall performance of their PCs (the "contract" and the breached "provisions"). (*See* Compl. ¶ 77.) Plaintiff also alleges that she paid, and TuneUp accepted, the purchase price of the software products ("performance") (*id.* ¶ 78), that TuneUp failed to provide software that performed the agreed-upon functions ("breach") (*id.* ¶¶ 79-80), and damages resulting from the breach (i.e., amounts overpaid for the software). (*Id.* ¶¶ 78, 85.)

Additionally, Plaintiff alleges that TuneUp breached the implied convenant of good faith and fair dealing.[9] That is, TuneUp took advantage of Plaintiff in a way that she could not have anticipated at the time she agreed to purchase the software inasmuch it intentionally designed TuneUp Utilities so that it would not honestly and accurately detect, report and repair legitimate errors and threats on her computer. TuneUp's behavior ultimately deprived Plaintiff of receiving the "intended fruits of the

---

[9]    In Illinois, "a covenant of good faith and fair dealing is implicit in every contract." *Horwitz v. Sonnenschein Nath and Rosenthal LLP*, 926 N.E.2d 934 (Ill. App. Ct. 2010). The covenant is meant "to ensure that parties do not take advantage of each other in a way that could not have been contemplated…or do anything that will destroy the other party's right to receive the benefit of the contract." *See Reserve at Woodstock, LLC v. City of Woodstock*, 958 N.E.2d 1100, 1112-13 (Ill. App. Ct. 2011).

contract" (software that performs as bargained for) and frustrated its purpose. (Compl. ¶¶ 81-82.)

## IV.    PLAINTIFF SUFFICIENTLY PLEADED HER UNJUST ENRICHMENT CLAIM.

Finally, TuneUp attacks Hall's alternative unjust enrichment claim, arguing that it did not

voluntarily receive a benefit from her and that it did not retain a benefit to her detriment. (Def. Mot. at

14-15.) That is not so.

To state a claim for unjust enrichment, Plaintiff must allege that TuneUp "(1) received a

benefit, (2) to the [her] detriment, and (3) the [TuneUp's] retention of the benefit would be unjust."

*TRW Title Ins. Co. v. Security Union Title Ins. Co.*, 153 F.3d 822, 828 (7th Cir. 1998). Here, Plaintiff

alleges that TuneUp voluntarily accepted a benefit from her in the form of the $29 fee she paid to

purchase the software. (Compl. ¶ 88.) TuneUp retained that benefit inasmuch as Hall has yet to receive

a refund of the monies she paid. And, finally, it would be unjust for TuneUp to retain those monies

because it failed to provide software with the promised capabilities (i.e., that could accurately identify,

report and repair various computer problems and errors). (*Id.* ¶ 90.)[10]

With these allegations, Plaintiff has sufficiently pleaded her alternative claim for unjust

enrichment and this claim should survive as well.

### CONCLUSION

For the foregoing reasons, Plaintiff Carole Grant Hall, individually and on behalf of all other

similarly situated individuals, respectfully requests that the Court enter an Order (i) denying

Defendant's motion to dismiss in its entirety,[11] (ii) requiring TuneUp Corp. to answer Plaintiff's First

---

[10]    Any argument that the TuneUp's purported EULA establishes that it was TuneUp Distribution that sold the software to Plaintiff and received the benefits of that sale is inapposite. As explained above, the EULA was not in effect at the time Plaintiff purchased the software and all other representations to Plaintiff identified TuneUp as the party with which she was dealing.

[11]    In the event the Court disagrees with Plaintiff and grants TuneUp's motion to dismiss, Plaintiff respectfully requests leave to add further detail, additional claims, or otherwise take the steps necessary to cure any defects found by the Court in her pleadings. *See, e.g., Sloan v. Vill. of Hickory Hills, Illinois*, 07 CV 7038, 2008 WL 4089966 (N.D. Ill. Aug. 27, 2008) (holding that leave to amend should be freely given).

Amended Complaint, and (iii) providing such other and further relief as the Court deems reasonable

and just.

Respectfully submitted,

**CAROLE GRANT HALL**, individually and on
behalf of all others similarly situated,

Dated: May 28, 2013

By: /s/ Rafey S. Balabanian
       One of Plaintiff's Attorneys

JAY EDELSON
jedelson@edelson.com
RAFEY S. BALABANIAN
rbalabanian@edelson.com
BENJAMIN H. RICHMAN
brichman@edelson.com
CHANDLER R. GIVENS
cgivens@edelson.com
EDELSON LLC
350 North LaSalle, Suite 1300
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378

## CERTIFICATE OF SERVICE

I, Rafey S. Balabanian, an attorney, hereby certify that on May 28, 2013, I served the above and foregoing ***Plaintiff's Opposition to Defendant's Motion to Dismiss the First Amended Complaint***, by causing a true and accurate copy of such paper to be filed and served on all counsel of record via the Court's CM/ECF electronic filing system, on this the 28th day of May 2013.


/s/ Rafey S. Balabanian